## TUPPELA v. CHICHAGOFF MINING CO.

(Circuit Court of Appeals, Ninth Circuit. July 6, 1920. Rehearing Denied September 7, 1920.)

### No. 3474.

1. **Courts ⬅433—Jurisdiction of Alaskan commissioner in matters of probate and guardianship limited.**

   The jurisdiction of a commissioner appointed under the laws of Alaska in matters of probate and guardianship is strictly limited, and compliance with all the requirements of the statute is essential to the validity of his acts.

2. **Insane persons ⬅65—Sale of property by guardian void.**

   An attempted sale and conveyance of mining claims owned by an insane person by his guardian appointed under the laws of Alaska, *held* void where the petition for appointment of the guardian was not verified as required by Comp. Laws Alaska 1913, § 1597, no citation was issued and served on filing of the petition for sale of the property, no oath was taken and subscribed by the guardian before sale as required by sections 1756, 1757, and 1760, and other provisions of the statute were not complied with.

3. **Insane persons ⬅65—Sale of property without notice void.**

   No valid order for the sale of property of an insane person can be made ex parte, and the fact that the owner is insane is no reason for dispensing with notice, but rather the contrary.

4. **Mines and minerals ⬅38(16)—Evidence held to establish ownership of claims.**

   Evidence *held* to sustain the allegation of a complaint that complainant was owner of a mining claim and of a half interest in other claims claimed by defendant, and entitled to a decree therefor and an accounting for ore taken therefrom by defendant.

5. **Mines and minerals ⬅97—Grubstake contract need not specify interest of each party.**

   It is not essential to the validity of a grubstake contract that it should specifically state the interest of each party thereto, the presumption being, in the absence of provision to the contrary, that the interests of the parties are equal.

Appeal from the District Court of the United States for Division No. 1 of the District of Alaska; Robert W. Jennings, Judge.

Suit in equity by John Tuppela against the Chichagoff Mining Company. Decree for defendant, and complainant appeals. Reversed.

Certiorari denied 254 U. S. —, 41 Sup. Ct. 61, 65 L. Ed. —.

The proper disposition of this appeal necessitates a somewhat full statement of the pleadings and proceedings in the court below. The appellant, who was plaintiff there, by his amended complaint alleged, in substance, that in the year 1914 he and the defendant corporation (appellee here) were co-owners, each owning an undivided half interest, in certain described lode mining claims on the west side of Chichagodd Island, in the Sitka Mining District of the territory of Alaska, known as "Over the Hill," "Rising Sun" "Pacific," and "Golden West," the first of which claims had been patented, and that in the same year the plaintiff was the sole owner of another lode claim similarly situated, called "Porphyry"; that at the same time, and for about five years preceding, the defendant was the owner of a group of mining claims adjoining those above described, through which there ran lodes or veins of gold-bearing quartz of a high grade, which it had been working extensively and

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

267 F.—48

at great profit, and that about the early part of the year mentioned it became known that ore bodies of similar richness and extent extended into and through the claims of the plaintiff; that thereupon the defendant, acting through certain specified agents, for the purpose of defrauding the plaintiff out of his said property, procured its attorney to file, on June 13, 1914, an unverified petition in the probate court at Sitka, Alaska, alleging that the plaintiff had been committed to the asylum for the insane, and praying that some suitable person be appointed guardian of his estate; that the said court fixed June 24, 1914, as the time for hearing the petition and on that day, without any notice whatever of said hearing or proceeding having been served upon the plaintiff, or otherwise as required by law, made a pretended order appointing one Mills as such guardian, which order the plaintiff alleged was wholly void for lack of jurisdiction of the court to make it, and for the reason that the petition therefor was not verified, failed to state jurisdictional facts, and that no notice of the hearing of such petition was ever served upon the plaintiff; that about June 1, 1914, the defendant took exclusive possession of the said alleged property of the plaintiff, in connection with its mining operations, and performed thereon the annual assessment work required by law for holding the same; that the plaintiff from and after June 11, 1914, was an inmate of the Morning Side Asylum, to which he had been committed by an order of the United States commissioner's court, Sitka precinct, during which time the alleged guardian purposely refrained from having any work done on the said mining clams in behalf of the plaintiff, and that thereafter, to wit, during the month of January, 1915, the defendant, through certain named agents, caused to be published a pretended notice to the plaintiff that it had expended $100 upon each of the said Over the Hill, Rising Sun, Golden West, and Pacific lode claims during the year 1914, and that if the plaintiff, within 90 days after said notice of publication, failed to pay his portion thereof as a co-owner, his interest would become the property of the defendant company; that the said notice was published only 60 days, and that no other or further service of such notice was made; that thereafter the defendant made claim to the entire ownership of the said four lode claims, notwithstanding that the said notice was fraudulent, insufficient in law, and void; that thereafter, and about May 1, 1915, the defendant according to the information and belief of the plaintiff, was advised by its attorney that its pretended claim of title to the plaintiff's half interest in the said claims was void; that thereafter, and in pursuance of the alleged scheme to defraud the plaintiff out of his said property, the defendant procured the plaintiff's said alleged guardian to apply, on or about May 19, 1915, to the said probate court of Alaska, at Sitka, for a license to sell the plaintiff's interests in the said four lode mining claims; that no notice of the hearing of the said application was given as required by law, and that the said alleged guardian had not qualified as such by giving a bond as so required, notwithstanding all which the said court pretended to make, June 28, 1915, an order licensing the said alleged guardian to sell the plaintiff's interest in the said four mining claims, reciting the same to be an undivided half interest therein, and also the plaintiff's entire interest in the said Porphyry lode claim, although no petition had been made for any license to sell the said Porphyry claim; that thereafter, and on October 19, 1915, without giving any bond as required by law, the said alleged guardian pretended to sell at public outcry and strike off to the defendant company for one lump bid of $1,000 the undivided half interest of the plaintiff in the said Over the Hill, Rising Sun, Golden West, and Pacific lode claims, and the whole interest of the plaintiff in the said Porphyry lode claim; that, as the plaintiff is informed and believes, the said pretended sale was conducted clandestinely before the hour of 9 o'clock in the morning, and pursuant to a previous agreement between the defendant company and the said alleged guardian that the defendant company should acquire the said property for the said sum of $1,000, and that thereafter, on the said 19th day of October, 1915, the said alleged guardian made a pretended deed, purporting to convey all of the said property of the plaintiff to the defendant company in consideration of the sum of $1,000, which sum the defendant and the said

alleged guardian well knew was a wholly inadequate consideration for the said property, which was then well worth more than 500 times that sum, as the defendant company and the said alleged guardian then well knew, for all of which reasons the said pretended sale was and is wholly void notwithstanding which the defendant has ever since excluded the plaintiff from the possession and use of his said property, claiming the same under said proceedings, thereby casting a cloud upon the plaintiff's title thereto; that thereafter, and on the 3d day of January, 1919, the defendant procured a patent to be issued by the government to the said Over the Hill lode claim in its own corporate name, the title to which, so conveyed, it holds in trust to the extent of an undivided one-half for the plaintiff.

The amended complaint further alleged that some time prior to the year 1915, the exact time being to the plaintiff unknown, the defendant had driven its main working tunnel through its own claim and into the claims owned by the plaintiff, as alleged, and ever since has been, and is now, engaged in extracting therefrom many thousands of tons of rich, gold-bearing ores, reducing the same in its plant and appropriating to its own use the proceeds thereof, and threatening and intending to continue so to do unless restrained by the court; that the ores so being mined and extracted from the claims of the plaintiff are being mined and extracted by means of a tunnel having its portal on its own ground, but which penetrates into plaintiff's ground about 5,000 feet from the portal, and at great depth, the facts concerning which are only fully known to the defendant, but that, according to the information and belief of the plaintiff, the gold extracted from such ores and appropriated by the defendant exceeds $5,000 per day in value; that the defendant has no other property than the said mine, and that as soon as the same is exhausted it will be without any property out of which a judgment against it can be collected. The prayer was for injunctive and other appropriate relief.

The amended answer of the defendant to the amended complaint, in addition to various admissions, denied that the plaintiff owned any interest in the Over the Hill, Pacific, Rising Sun, or Golden West claims, and denied that the plaintiff owned in 1914 any interest in the Porphyry lode claim. It put in issue all of the allegations of fraud on the part of the defendant made by the plaintiff, and while admitting that the probate court at Sitka appointed W. P. Mills guardian of the plaintiff's estate on June 24, 1914, denied that the court was without jurisdiction to make the order, and alleged that notice of the hearing of the petition therefor was duly given according to law. The answer admitted the performance by the defendant of the annual assessment work required by law upon the Over the Hill, Rising Sun, Golden West, and Pacific lode claims during the year 1914, and admitted that the defendant published the notice required by law to the plaintiff and all others interested in the property, that it had expended the sum of $100 upon each of those claims during the year mentioned. It denied that it procured the guardian to apply to the probate court for a license to sell any of the plaintiff's property, and denied that the guardian intentionally refrained from having work done on the said Over the Hill, Rising Sun, Golden West, and Pacific lode claims on plaintiff's behalf. It alleged that the said guardian duly applied to the probate court at Sitka in June, 1915, for an order to sell all of the property belonging to the plaintiff, and that the said property was sold at public auction in the manner prescribed by law on October 19, 1915, at which sale the defendant bid and paid the sum of $1,000 for all of the interest of the plaintiff in each of those claims. It denied that the sale was conducted clandestinely and before the hour of 9 o'clock in the morning, or that the defendant had any understanding regarding the price of the property, admitted the making of a valid and sufficient deed by the guardian to the defendant of all of the interest of the plaintiff in each of the said claims in consideration of the sum of $1,000 paid therefor, which the defendant denies was inadequate, and admitted that ever since that time the defendant has excluded the plaintiff from the possession or use of the Pacific, Rising Sun, and Over the Hill claims, and that for the Over the Hill claim it procured a patent in its own corporate name, and of which claim it alleges it was the sole owner. The answer also

put in issue the allegations of the amended complaint respecting the driving of any tunnel into any claim owned by the plaintiff, or the extraction or appropriation of any gold or gold-bearing ores from any property of the plaintiff, and respecting any threats of the defendant so to do.

And as a first affirmative defense the defendant alleged, among other things, that the Pacific lode claim was located by William R. Hanlon October 24, 1907, and the Golden West claim July 22, 1910; that the Over the Hill claim was located in March, 1906, by H. A. Bauer, and the Rising Sun claim by the plaintiff July 22, 1910. As to the Golden West and the Porphyry claims, the defendant disclaimed any interest, but alleged that on February 12, 1913, Hanlon, for a valuable consideration, sold his interest in the Pacific claim to the defendant, since which time the defendant has been the sole owner thereof and in the sole and undisturbed possession of it; that on December 9, 1915, Bauer, who was then the sole owner of the Over the Hill claim, sold all of his interest therein to the defendant, since which time the defendant has been the sole owner of the claim and in the sole and undisturbed possession thereof, and for which it subsequently procured a patent from the United States; that prior to June 14, 1914, the plaintiff was adjudged insane by the probate court of Sitka precinct, territory of Alaska, by which court W. P. Mills was, on the 24th day of June, 1914, duly and regularly appointed guardian of the estate of the plaintiff, and duly qualified as such, and that the interest of the plaintiff in the Rising Sun claim thereby became lawfully vested, on October 19, 1915, in Mills as such guardian, on which last-mentioned day, pursuant to an order of sale duly and regularly made by that court, Mills, as such guardian, sold and conveyed all the interest of the plaintiff in the Rising Sun and Porphyry lode claims to the defendant, which sale was on the same day duly confirmed by the court, since which time the defendant has been the sole owner and in the exclusive possession of the said Rising Sun and Porphyry claims.

As further affirmative defenses the defendant alleged, among other things, that at the time of the conveyances from Hanlon, Bauer, and the guardian the Over the Hill claim was considered of no value, but that 18 months after the execution of the deed by the guardian the defendant, at great cost, discovered a body of ore in it, which the defendant since December, 1917, has paid out large sums in developing and mining; that on the day last mentioned the plaintiff, having been fully cured and having regained his reason, was discharged from the asylum, at which time, and for a long time prior thereto, he knew and understood that Mills, as guardian of his estate, had sold and conveyed all of his interest in the Over the Hill claim to the defendant, and that the defendant was expending large sums of money in the development thereof, notwithstanding which knowledge the plaintiff failed and neglected to assert any right in the Over the Hill claim, but purposely waited for a period of 17 months before bringing the present suit or asserting any claim to the property, which delay was for the sole purpose of inducing the defendant to expend large sums of money in the development of the property, thereby estopping the plaintiff from claiming any right or interest therein.

Replying to the first affirmative defense, the plaintiff admitted that the Pacific and Golden West claims were located by Hanlon and the Rising Sun by the plaintiff at the respective dates alleged by the defendant, but denied that the Over the Hill claim was located by Bauer, and alleged that it was located by the plaintiff, Charles Peterson, and W. R. Hanlon on the 26th day of March, 1908; admitted that on February 12, 1913, Hanlon sold all his interest in the Pacific claim to the defendant, but denied that the latter since that date or at any other time has been or is the sole owner of the Pacific claim, or of any greater interest than an undivided one-half interest thereof; it denied that Bauer was on December 9, 1915, the sole owner of the Over the Hill claim, or any interest therein, although admitting that on December 9, 1915, Bauer executed a quitclaim deed of the Over the Hill claim to the defendant.

For further reply to the affirmative defense of the defendant the plaintiff alleged that prior to 1911 he acquired from Hanlon an undivided interest in the Pacific claim and that during the years 1911 and 1912 and to February

12, 1913. Hanlon and the plaintiff were in the joint possession and jointly claimed it and maintained their right of possession thereto; that in 1912 Hanlon failed to perform his part of the assessment work thereon, which, however, was performed by the plaintiff; that thereafter, and prior to February, 1913, the plaintiff notified Hanlon of that fact, and that unless he contributed his part thereof his interest in the claim would be forfeited to the plaintiff; that Hanlon failed to contribute his part of such assessment work, and that his interest in the claim would have become forfeited to the plaintiff, but that the defendant, as successor in interest of Hanlon, in March, 1913, paid the amount due from him to the plaintiff; that the Over the Hill claim was located March 26, 1906, by the plaintiff, Hanlon, and Peterson, who were on that day prospecting together under a "grubstake" agreement with Bauer to jointly and equally share all locations made by either; that plaintiff, Peterson, and Hanlon jointly made discovery upon the Over the Hill claim, and jointly marked the boundaries thereof, but at the request of Hanlon the location notice was posted thereon in the name of Bauer, but with the distinct agreement that the claim should be owned by the plaintiff, Hanlon, Peterson, and Bauer in the proportion of one-fourth each, which agreement was ratified and approved by Bauer; that thereafter, to wit, January 10, 1907, Peterson sold and conveyed his quarter interest to Bauer, who thereupon became the owner of one-half of said claim, but continued to hold the remaining one-half in trust for Hanlon and the plaintiff; that the plaintiff and Hanlon for the years 1909, 1910, and 1911 performed all the assessment work upon the said claim, Hanlon performing one-fourth thereof, the plaintiff performing the remaining three-fourths, the said Bauer failing and refusing to perform any of the said assessment work or to contribute to the same; that in the year 1912 Hanlon and the plaintiff gave due notice to Bauer of the performance of the said work on the Over the Hill claim, and that unless he paid his part thereof within 90 days his interest therein would be forfeited to his co-owners; that Bauer refused to pay, admitted and acquiesced in such forfeiture, and abandoned all further claim to the Over the Hill claim, and during the years 1912, 1913, 1914, and 1915 failed and neglected to perform or offer to perform, or to pay or offer to pay, any part of the assessment work on said claim, well knowing during all of that time that his former interest was being claimed under the said forfeiture proceeding, and that his successors in interest thereunder were on the faith thereof performing the assessment work necessary to hold and maintain the claim, by reason of which Bauer and the defendant are estopped to assert any claim to that property adverse to the title obtained by the plaintiff and Hanlon under the said forfeiture proceedings; that on February 12, 1913, Hanlon quitclaimed to the defendant an undivided half interest in and to the Pacific, Over the Hill, Rising Sun, and Golden West claims, and that as soon as the plaintiff learned of that quitclaim deed, to wit, in March, 1913, he informed the defendant of all of the facts above stated, and that Hanlon did not own an undivided half interest in the Over the Hill claim, and never at any time owned a half interest therein, and that he owned no interest in the Rising Sun claim, but that because of the confusion and uncertainty of the record title of some of the said claims, and to avoid litigation, it was then and there agreed between the plaintiff and the defendant that the said Over the Hill, Pacific, Rising Sun, and Golden West claims should thereafter be held and owned in common by the plaintiff and the defendant, in the proportion of one-half each, and that during that year, and until June 4, 1914, the plaintiff and the defendant were in the joint possession of the said claims, claiming and holding the same as equal co-owners, and that no other person had or asserted any interest therein; that during the said year the defendant performed the assessment work upon the Pacific claim, for the joint use and benefit of the plaintiff and the defendant, and at the special request of the defendant the plaintiff performed the annual assessment work upon the Over the Hill, Rising Sun, and Golden West claims for the joint use and benefit of the plaintiff and the defendant, and that the defendant is now estopped from asserting and claiming that the plaintiff was not a co-owner with the defendant in and to said claims during the years 1913 and 1914.

In his reply the plaintiff further alleged that he is, an uneducated prospector, not familiar with the laws relating to the acquisition of title to mining claims, and did not suppose it was necessary in order to perfect his right to obtain a quitclaim deed or other conveyance from Bauer at the time he expressly acquiesced in the forfeiture alleged; that on December 9, 1915, the defendant, being desirous of applying for a patent to the Over the Hill claim, and knowing the condition of the record title thereto, obtained from Bauer a quitclaim deed therefor for a nominal consideration, well knowing that Bauer had no interest therein, which deed was, as a matter of law, obtained for the joint use and benefit of the plaintiff and the defendant, the actual and real owners of the said claim; that from the dates of the respective locations of the Over the Hill, Pacific, and Golden West claims until February 12, 1913, the plaintiff was in joint possession thereof with the persons in whose names said claims were located, claiming the interest therein specifically set out: that his ownership of such interest was at all times recognized and admitted, and that during all of said times plaintiff duly performed his part of the annual work necessary to preserve their possessory rights under the mining laws; that from February 12, 1913, until October, 1915, he was in joint possession of the said claims with the defendant, the latter recognizing and admitting his right and title as an equal co-owner, and accepting the benefit of his labor thereon for the purpose of holding the said claims and preserving the possessory rights thereto under the mining laws, until he was sent to the asylum in June, 1914; that the defendant never asserted any right adverse to the plaintiff's half interest in and to the said claims until it made the pretended purchase from his guardian in October, 1915, by reason of all which the defendant is estopped from asserting or claiming that the plaintiff was not such co-owner with it in the said claims from and after February 12, 1913, to October, 1915.

In his reply the plaintiff admitted that at least as early as April, 1917, the defendant discovered a large body of ore in the Over the Hill claim, since which time it has been mining the same, and alleged that whatever moneys defendant may have expended in developing said claims and in procuring patents therefor have long since been fully repaid out of the gold extracted therefrom, and that there is due and owing the plaintiff from the defendant upon an accounting therefor a sum exceeding $500,000, after allowing it all proper charges for its expenditures. The reply contained other allegations, the substance of some of which has already been stated in the foregoing, the remainder of it being unnecessary to insert.

There was much evidence given in behalf of the respective parties, and four special issues of fact submitted by the court to a jury impaneled in the case, with its answers thereto, followed by findings of fact made by the court, upon which a decree was entered dismissing the bill of complaint, with costs to the defendant.

John H. Cobb and John R. Winn, both of Juneau, Alaska, for appellant.

Overton G. Ellis and Robert E. Evans, both of Tacoma, Wash., and H. L. Faulkner, of Juneau, Alaska, for appellee.

Before GILBERT, ROSS, and HUNT, Circuit Judges.

ROSS, Circuit Judge (after stating the facts as above). [1] For a number of reasons we are of the opinion that upon the record it is impossible to sustain the decree appealed from, first, because the attempted sale and purchase of the complainant's property under and by virtue of the guardianship proceedings was wholly null and void. Chapter 79 of the Compiled Laws of the Territory of Alaska (1913) contains certain general provisions respecting the administration of estates, among which is section 1595, which is in part as follows:

"The commissioners appointed in pursuance of this act and other laws of the United States have jurisdiction within their respective precincts, subject to the supervision of the district judge, in all testamentary and probate matters; that is—

"First. To take proof of wills.

"Second. To grant and revoke letters testamentary, of administration, and of guardianship.

"Third. To direct and control the conduct and settle the accounts of executors, administrators, and guardians. * * *

"Seventh. To take the care and custody of the person and estate of a lunatic or habitual drunkard and to appoint and remove guardians therefor; to direct and control the conduct of such guardians and to settle their accounts. * * *"

Sections 1596 and 1597 of the same chapter are as follows.

"Sec. 1596. There are no particular pleadings or forms thereof in proceedings before commissioners when exercising the jurisdiction of probate matters, as specified in the section last preceding, other than as provided in this chapter.

"Sec. 1597. The mode of proceeding is in the nature of a suit in equity as distinguished from an action at law. The proceedings are in writing, and are had upon the application of a party or the order of the court. The court exercises its powers by means of—

"First. A citation to the party;

"Second. An affidavit or the verified petition or statement of a party;

"Third. A subpœna to a witness;

"Fourth. Orders, judgments, and decrees;

"Fifth. An execution of warrant to enforce them."

In chapter 88 of the same Laws, under the title "Of Guardians and Wards," is section 1720, which reads as follows:

"The commissioner for each precinct, when it shall appear to him necessary or convenient, may appoint guardians to minors and others being inhabitants or residents in such precinct, and also such as shall reside without the district and have any estate within the same."

The section last quoted is the same as section 888 of Carter's Ann. Code Civ. Proc., upon which the decision of this court in the case of Martin et al. v. White, 146 Fed. 461, 76 C. C. A. 671, was largely based.

By section 1723 of chapter 88 every such guardian is required to give bond, with surety or sureties, to the United States, in such sum as the commissioner may order, with certain specified conditions, including the requirement that he should make a true inventory of all of the real and personal property of the ward that should come to his possession or knowledge, and return the same to the commissioner within a stated time, and should dispose of and manage all of such estate according to law and the best interests of the ward, and should render an account under oath of all such property, and of his management and disposition thereof, within a prescribed time, and at the expiration of his trust should settle his accounts with the commissioner and pay over the amounts remaining in his hands to the person or persons adjudged entitled thereto.

By section 1734 it is provided that every guardian appointed under the provisions of chapter 88 shall pay all just debts due from his ward out of his personal estate if sufficient, and, if not, then out of his real estate, upon obtaining a license for the sale thereof as provided by law; and, by the next section, that, in the event the income and profits from

the estate of the ward be insufficient for his comfortable and suitable maintenance and that of his family, the guardian may sell the real estate upon obtaining a license therefor, as provided by law.

By section 1755 it is declared that—

"In order to obtain a license for such sale the guardian shall present to the commissioner of the precinct in which he was appointed guardian a petition therefor, setting forth the condition of the estate of his ward and the facts and circumstances under which it is founded, tending to show the necessity or expediency of such a sale which petition shall be verified by the oath of the petitioner."

Sections 1756, 1757, 1758, 1760, and 1761 are as follows:

"Sec. 1756. If it shall appear to the commissioner from such petition that it is necessary or would be beneficial to the ward that such real estate or some part of it should be sold, he shall thereupon make an order directing the next of kin of the ward and all persons interested in the estate to appear before him at a time and place to be therein specified, not less than four nor more than eight weeks from the time of making such order, to show cause why a license should not be granted for the sale of such estate.

"Sec. 1757. A copy of such order shall be personally served on the next of kin of such ward, and on all persons interested in the estate, at least ten days before the hearing of the petition, or shall be published at least three successive weeks in a newspaper circulating in the district, to be specified by the commissioner.

"Sec. 1758. No such license shall be granted for the sale of any real estate of a ward, excepting that of a minor, unless the commissioner of the precinct of which the ward is an inhabitant shall certify in writing his approbation of the proposed sale."

"Sec. 1760. Such guardian shall also, before fixing on the time and place of sale, take and subscribe an oath before the commissioner or some other officer competent to administer the same, in substance as follows: That in disposing of the estate which he is licensed to sell he will use his best judgment in fixing the time and place of sale, and that he will exert his utmost endeavors to dispose of the same in such manner as will be most for the advantage of all persons interested therein.

"Sec. 1761. He shall also give public notice of the time and place of sale and shall proceed therein in like manner as is prescribed for executors and administrators; and the evidence of giving such notice may be perpetuated in the same manner and with the same effect as is provided in the case of sales of real estate by executors and administrators."

That the court of the commissioner is one of limited jurisdiction, and a compliance with the requirements of the statute is essential to vest any jurisdiction in it, was expressly held by this court in the similar case of Martin et al. v. White, supra, decided June 20, 1906. See the numerous authorities there referred to, which it is unnecessary to again cite.

In principle, an apt illustration will be found in the decision of the Supreme Court of California in 1882, in the case of Stevenson v. Superior Court of City and County of San Francisco, 62 Cal. 60, where the question was whether the court in which was had administration upon the estate of a man supposed to have been dead, but who subsequently and after the administration had been closed appeared and moved the entry of an order vacating and annulling the proceedings, rightly granted the motion and entered the order. In sustaining that action of the trial court the Supreme Court of the state held that while it is true that the court of probate, before issuing letters of administra-

tion, must first determine affirmatively the question of death, the subsequent showing of the fact that the man was all along alive established the nullity of the entire proceedings because of the lack of the essential "subject-matter" for the jurisdiction of any court; citing among other cases that of Griffith v. Frazier, 8 Cranch, 23, 3 L. Ed. 471, where Chief Justice Marshall said:

"Suppose administration to be granted on the estate of a person not really dead. The act, all will admit, is totally void. Yet the ordinary must always inquire and decide whether the person whose estate is to be committed to the care of others be dead or in life. It is a branch of every cause in which letters of administration issue. Yet the decision of the ordinary that the person on whose estate he acts is dead, if the fact be otherwise, does not invest the person he may appoint with the character or powers of an administrator. The case, in truth, was not one within his jurisdiction. It was not one in which he had a right to deliberate. It was not committed to him by the law. And although one of the points occurs in all cases proper for his tribunal, yet that point cannot bring the subject within his jurisdiction."

Mr. Justice McKee in his concurring opinion in Stevenson v. Superior Court, after making reference to a number of decisions not mentioned in the principal opinion, continued on page 65 of 62 Cal.:

"I know of no case opposed to the doctrine of those cases except it be the case of Roderigas v. East River Savings Institution, 63 N. Y. 460. In that case the Supreme Court of New York held that money paid to the administrator of a supposed decedent could not be recovered back although it appeared that at the time of issuing the letters of administration the party was not dead. But in Lavin v. The Emigrant Industrial Savings Bank, 18 Blatch. 1, in the Circuit Court of the United States for the state of New York, it was decided that that case had no support elsewhere in the authorities of the English or American courts. A living person, says the court, cannot be concluded by a surrogate's decision that he is dead. As to him, such a decree is absolutely void, and he may claim his property as taken from him 'without due process of law.'"

[2] Applying the law as declared by this court in the case of Martin et al. v. White, supra, and in the other cases above referred to, the essential point of all of which is that there must be a subject-matter for the exercise of jurisdiction, and a substantial compliance with the provisions of the statute in order to deprive any one of his property by virtue of it, we think it perfectly clear that the proceedings under which Mills, as guardian of the appellant, Tuppela, undertook to sell and convey his interest in the Over the Hill, Rising Sun, Pacific, Golden West, and Porphyry claims, were absolutely void. As to the one last mentioned, the petition did not even ask for its sale or make any reference to it.

As has been shown, section 1597 of the Code of Alaska expressly requires the petition for the appointment of a guardian to be verified and all of the proceedings to be in writing.

Turning to the record, it is seen that the fundamental step in those proceedings—the petition for the appointment of a guardian—lacked the essential verification required by the statute. Furthermore, the record shows that the only attempt of the petitioner to comply with one of the first requirements of the statute authorizing the court to exercise

the power conferred upon it, to wit, the giving of "a citation to the party," was the following:

"In the Matter of the Appointment of a Guardian for John Tuppela, an Insane Person—Notice of Hearing.

"The petition of A. G. Shoup, guardian ad litem for said John Tuppela, an insane person, having been heretofore filed in this court, notice is hereby given that hearing will be had in the said matter in the office of the commissioner at Sitka, Alaska, at the hour of ten o'clock in the forenoon of the 24th day of June, 1914.

"Dated at Sitka, Alaska, this 13th day of June, 1914.

"[Signed]   R. W. De Armond, Commissioner and Ex Officio Probate Judge."

It is true that on the trial it was admitted that the appellant was duly and regularly adjudged insane on the 4th day of June, 1914, by the same commissioner, and that at the time of the application for the appointment of a guardian of his estate he was confined in the Morningside Hospital for the Insane at the city of Portland, state of Oregon. But we think it is too plain for argument that those facts have no bearing whatever upon the question as to the lack of the essential verification of the petition for the appointment of a guardian of his estate.

[3] Moreover, while the statute does not in terms provide for notice of the petition, the proceedings are, as said by the Supreme Court of Indiana in the case of Martin v. Motsinger, 130 Ind. 555, 558, 30 N. E. 523, 524, cited with approval by this court in Martin v. White, 146 Fed. 466, 76 C. C. A. 676, of "such a character that they cannot be ex parte and be valid. If the statute was to be construed as authorizing proceedings of an ex parte character, it would be, to that extent, in conflict with the Constitution of the United States and void."

It is not pretended that prior to the making of the order appointing Mills guardian of the appellant, or prior to the making by him of the attempted sale in question, nor, indeed, prior to November 15, 1919 (more than five months after the commencement of the present suit), was there any order of record, or any order even in writing directing the service upon the appellant, or upon any one else, of notice of the application for the appointment of Mills as such guardian. But the record shows that on the day last mentioned, to wit, November 15, 1919, the commissioner entered an order as of date June 13, 1914, directing that notice of the hearing of the application for the appointment of a guardian of the estate of appellant "be given by posting three copies of notice of hearing, signed by said commissioner and ex officio probate judge, in three conspicuous places in the town of Sitka, for a period of 10 consecutive days next prior to said date of hearing," to wit, June 24, 1914, at 10 a. m., at the office of the commissioner and ex officio probate judge in Sitka. But since that nunc pro tunc order shows upon its face, and, indeed, embodies an express finding of fact to the effect that the order directing the service of such notice was an *oral* order, which the statute, as has been shown, expressly required to be *in writing*, nothing more need be said to show that it was wholly ineffectual to remedy a second fatal defect existing in the first and fundamental step in the proceedings in question.

Other fatal defects in those proceedings may be briefly referred to.

They are a failure to show a compliance with the provisions of section 1756 of the statute, which, as has been seen, provides that should it appear from the petition that it is necessary or would be beneficial to sell the whole or part of the real estate of the ward, the commissioner, by an order, should direct the next of kin and all persons interested in the estate to appear before him at a specified time and place, not less than four nor more than eight weeks from the time of making the order, to show cause why a license for such sale should not be granted; with the provision of section 1757, requiring such order to be personally served on the next of kin and all persons interested at least 10 days before the hearing of the petition, or published in a prescribed way; with the provision of section 1758, expressly declaring that no such license shall be granted unless the commissioner shall certify in writing his approbation of the proposed sale; with the provision of section 1760, declaring that the guardian before fixing the time and place of sale shall take and subscribe an oath in substance that he will use his best judgment in fixing the time and place of sale, and will exert his utmost endeavors to dispose of the property to the best advantage of all persons interested; and with the provision of section 1761, declaring that he shall give public notice of the time and place of sale, and proceed otherwise as is prescribed for executors and administrators.

It cannot be doubted that the appellant was at least one of the persons interested in his own estate. The suggestion that because he was then insane no benefit to him could result from giving him notice is well answered by the Supreme Judicial Court of Massachusetts in the case of Allis v. Morton and another, 4 Gray's Rep. 63, 64, where that court said:

"To say one is insane, and therefore need not be notified, is to decide the question before it is tried. Nor would the existence of insanity be a good reason for dispensing with the notice. A man may be insane so as to be a fit subject for guardianship, and yet have a sensible opinion and strong feeling upon the question who that guardian shall be. And that opinion and feeling it would be the duty as well as the pleasure of the court anxiously to consult, as the happiness of the ward and his restoration to health might depend upon it. But if the party is wholly demented, yet there are always friends interested in the question, and whom the notice might reach; and the very fact of his incapacity to take care of himself furnishes a sound reason for caution and publicity in all the steps taken."

[4] The appellee having by its answer disclaimed any interest in both the Porphyry and Golden West claims, it is only necessary to inquire into the proof regarding the interest of the appellant in the Pacific, Rising Sun, and Over the Hill claims.

The evidence shows without conflict that the Pacific claim was located by one Hanlon October 24, 1907, who thereafter, and prior to February 12, 1913, conveyed an undivided one-half thereof to the appellant, and on the day last mentioned conveyed the other undivided one-half to the appellee, leaving the appellant and the appellee the owners in equal parts of the whole of that claim.

The evidence also shows without conflict that the Rising Sun claim was located by the appellant July 22, 1910, and that he performed the assessment work thereon for the years 1911, 1912, and 1913, an undi-

vided one-half of which claim Mills undertook as guardian to sell and convey to the appellee by his deed of October 16, 1915, as part of the void proceedings above referred to.

The ninth finding of fact made by the court respecting that claim is as follows:

"That the Rising Sun lode mining claim was discovered, staked, and located by the plaintiff, John Tuppela, on July 22, 1910, and location notice in the sole name of John Tuppela was duly filed and recorded according to law, and the said John Tuppela was the sole owner of said claim until October 16, 1915; and that he now is the owner of an undivided one-half interest in said Rising Sun claim, which said one-half interest was not embraced in the property conveyed by said guardian."

The conclusion of law drawn by the court based upon its findings of fact (hereinafter more specifically referred to) is as follows:

"That plaintiff has no right, title, or interest in or to any of the claims named in said complaint save and except an undivided one-half interest in the claim known as the Rising Sun, which said half interest was not involved in this case, and is not entitled to any equitable relief, and that the complaint be dismissed, with costs."

It therefore appears that the court itself found the fact to be that the plaintiff was the owner of the entire interest in the Rising Sun claim if the attempted conveyance by the guardian of the undivided half thereof to the appellee company was void and of no effect. Erroneously holding it valid, the court drew the further erroneous conclusion that the other undivided half of the claim was not involved in the suit.

Regarding the remaining claim—the Over the Hill—it is undisputed that it was located March 26, 1906, in the name of H. A. Bauer; but it was and is contended by the appellant that the location was made under and in pursuance of what is commonly known among miners as a "grubstake" agreement for the equal benefit of Bauer, W. R. Hanlon, Charles Peterson, and the appellant, Tuppela. The record shows the notice of location to have been signed thus:

"Locators:

"H. A. Bauer,
"Per agent, Wm. R. Hanlon.

"Wm. R. Hanlon,
"Agent for H. A. Bauer.
"Witnesses:
"Chas. Peterson."

Evidence having been given on that controverted question, the trial court submitted to a jury four certain issues of fact bearing on it, which, together with the answers of the jury thereto, are as follows:

"Question No. 1: Did Tuppela have a meeting with Bauer and Hanlon on the steamer 'Cottage City' in the fall or winter of 1905, as testified to by him and denied by Bauer and Hanlon?

"Answer: Yes.

"Question No. 2: What, if anything, was said or done by Bauer at that meeting, or in Bauer's presence, which would lead a reasonable man to believe that Tuppela was to have any particular, i. e., specific interest in what might be located?

"Answer: Grubstake understanding arrived at.

"Question No. 3: What interest was Tuppela to have in mining claims located pursuant to the terms agreed upon at such meeting?

"Answer: Unable to answer.

"Question No. 4: Did Tuppela, pursuant to such terms, assist in the discovery and location of the Over the Hill claim?

"Answer: Yes.

"(Be sure to answer question No. 1, but, if you answer question No. 1 in the negative, you need not answer questions Nos. 2, 3, or 4.)

"T. E. P. Keegan, Foreman."

The verdict of the jury upon the issues submitted to it does not appear from the record to have been expressly set aside, but was disregarded, and the facts found to be otherwise in the following subsequent and further findings of fact made and filed by the court:

"III. That thereafter (to wit after appellee's attempted purchase from the guardian), learning that H. A. Bauer claimed to own the mining claim known as the Over the Hill, defendant, for a valuable consideration, obtained the said Bauer's title, or supposed title, as hereinafter stated, and thereafter, believing it had acquired all adverse interests, or supposed adverse interests, duly and regularly applied for, and on January 3, 1919, obtained, a patent from the United States for the said Over the Hill claim. Said Bauer's title to said claim was as set forth in finding IV immediately succeeding.

"IV. That in the winter of 1905–1906 one W. R. Hanlon was employed by the said H. A. Bauer to prospect for, discover, and locate lode mining claims for, and in the name of, said Bauer, said Bauer undertaking to pay the wages of said Hanlon and his necessary assistants to be selected by Hanlon and all other costs and expenses of said undertaking; that, in pursuance of said employment, the mining claim called the Over the Hill was duly discovered and located by the said Hanlon for and in the name of said Bauer, and the location notice of said claim was duly and regularly recorded; the ground embraced in said Over the Hill claim is substantially the same mining ground as that embraced in the Sea Foam, which had been previously discovered, staked, located, and recorded by the said Hanlon for and in the name of one Bernard Hirst, who had abandoned the same; that there was no agreement of any kind by which plaintiff, or any one except Bauer, was to have any interest in, or aliquot part of, said Over the Hill claim, and that as a matter of fact plaintiff never did have any interest whatsoever in or to said claim, but that he, nevertheless, claimed to have an interest therein; that said mining claim was of a purely speculative value, and said Bauer, being a mining promoter and desiring to promote a corporation for the purpose of placing upon the market said claim and other claims of which he was the owner, took from plaintiff the power of attorney marked 'Exhibit G' in this case, not intending, however, thereby to acknowledge, and not thereby acknowledging, that said plaintiff did in fact have any interest in said claim to convey or deal with.

"V. That, in ignorance of the true state of the title of said claim, defendant paid to said W. R. Hanlon a certain consideration for a supposed half interest therein, and was informed that plaintiff herein was the owner of the other half interest, which said other half interest, or supposed half interest, defendant acquired, or attempted to acquire, at the guardian's sale heretofore mentioned.

"VI. That on the 9th day of December, 1915, said H. A. Bauer, for a valuable consideration, sold, set over, transferred, and assigned unto the defendant all his right, title, and interest in and to said Over the Hill claim. Said purchase was made in aid of the said purchase or supposed purchase, at guardian's sale, and was not for the protection of any tenancy in common, or supposed tenancy in common."

In the opinion accompanying the findings of the court it is stated that, assuming the plaintiff's testimony regarding the making of the

"grubstake" agreement to be true, it "lacked the fundamental requirement which must exist before what is called a 'grubstake' agreement can be enforced as a resulting trust, to wit, an agreement for a specific aliquot part."

And again the judge says in his opinion:

"I cannot find that the evidence even preponderates (to say nothing of being 'clear and convincing') in the direction that there ever existed any such contract as would in law give rise to a resulting trust. Before such trust 'results' two essentials are requisite: (1) The agreement must have existed at the time of the payment or the doing of the work; (2) such agreement must be for a specific aliquot part."

[5] The court was clearly in error in holding it essential to the validity of a grubstake contract that it should specifically state the interest of each party thereto. Morrow v. Matthews et al., 10 Idaho, 423, 79 Pac. 196. Even in the case of an ordinary conveyance of lands to two or more persons as joint tenants or tenants in common, such a specification of interest is not essential. In such cases, prima facie, the interest of each is equal, although the contrary may of course be shown. Markoe v. Wakeman, 107 Ill. 251; Shiels v. Stark, 14 Ga. 429; Jackson v. Moore, 94 App. Div. 504, 87 N. Y. Supp. 1101.

The contention of the plaintiff in the court below in respect to the Over the Hill claim was, as stated in the opinion of that court, based upon an alleged agreement between Bauer, Hanlon, and himself, by which Bauer was to furnish the "grub," etc., and the plaintiff and Hanlon were to do the work of prospecting and locating the contemplated claims; Peterson being subsequently joined with Hanlon and the plaintiff by consent of Bauer given through his agent Hanlon.

In finding as a fact, as the court did contrary to the finding of the jury upon that issue, that no such contract was ever entered into, the court relied in part upon the testimony of Hanlon to the effect that he located the Over the Hill claim for Bauer and in his name, and that, although he had hired the plaintiff and Peterson to assist generally in making locations for Bauer, and that Bauer paid them for their services, yet that in regard to the Over the Hill claim he (Hanlon) was the only one who made any discovery thereon or took any part in making the location thereof, testifying particularly, as the court below said in its opinion, that the plaintiff took no part in its location and never had any interest in that claim. The court, however, proceeded to say in its opinion:

"On cross-examination this witness was impeached by the showing that many of his statements were at variance with statements made by him in the pleadings and at the trial of a suit which he himself had previously brought against the defendant company to recover an interest in the Over the Hill for himself. He lost that suit. As to many matters testified to by Hanlon he was evidently falsifying at one trial or the other, and was considerably embarrassed; but I think it more likely that he was falsifying at that trial, where his interests were at stake, than at this trial, in whose outcome he is not shown to have any interest whatsoever."

It is thus made clear that Hanlon committed perjury either in the present case or in the suit brought by him against the present appellee to recover for himself an undivided interest in the Over the Hill claim.

The court below concluded that he perjured himself in his own case and told the truth in the present one, and, as has already been shown, found the fact to be, contrary to the finding of the jury, that the alleged contract between the plaintiff, Bauer, and Hanlon was never made. Yet the record in the present case shows that Bauer was also a witness in the case brought by Hanlon against the Chichagoff Mining Company to recover an undivided one-fourth interest in the Over the Hill claim, when the following questions were asked, and the following testimony given by Bauer:

"Q. Didn't the judge ask you this question: 'When Mr. Hanlon went out to locate the claims, did you or did you not—I am not talking about any particular claims, but when he went out to locate some claims there—did you or did you not have any agreement with him by which he was to do certain things and you were to do certain things?' Do you remember that question being asked you? A. I believe so; yes.

"Q. And you answered it: 'I did; yes.' A. I thing so; yes.

"Q. And did he ask you this question: 'What was that agreement?' Do you remember that question? A. I believe I do; yes.

"Q. 'A. He was to do the locating and work, and I was to furnish the money.' Did you answer it that way? A. I think so.

"Q. 'When was that agreement made?' Remember being asked that? A. I think I do.

"Q. 'A. Just after the strike was made at Chichagoff.' Did you so answer? A. I think I did.

"Q. He then asked you this question: 'After the strike was made, but before any of these claims were located, is that it?' And your answer was: 'Yes, sir.' Did you so testify? A. Just read that over again.

"Q. The judge asked you this question: 'After the strike was made, but before any of these claims were located?' And you answered: 'Yes, sir.' A. I probably did not exactly understand that question at the time, you know.

"Q. Did you so testify? A. I think I did; yes, sir.

"Q. And then was this question asked you: 'About when was it?' And you answered: 'That was about'—then you paused—'I think June, 1906.' Did you so testify? A. I might have testified to that. I wasn't familiar with the dates, or anything of that kind, you know—it was so long ago.

"Q. Was this question asked you then by the judge: 'Now, what claims did he locate under that agreement?' Do you remember that question? A. I think so; yes, sir.

"Q. And your answer was: 'He located the Golden Wedge, that is the placer, the Over the Hill claim, I think was one, and I think the Porphyry, and one other; I don't remember exactly what the name of it was.' Did you so testify? A. I think so; yes."

The plaintiff testified, in substance, that in the winter of 1905–1906 he and Hanlon met Bauer on the steamer "Cottage City" at the wharf in Sitka, upon which steamer Bauer was leaving for Seattle, and that they then and there agreed that in the spring the plaintiff and Hanlon should go to Chichagoff, where a discovery of gold had then been recently made, and prospect and locate claims, the supplies to be furnished by Bauer from Mills' store in Sitka, and all claims located to be shared equally between the three; that about the middle of March, 1906, Hanlon got the necessary supplies at Mills' store, but, finding that the boat in which they were to go required three men to handle, Peterson was procured to join the party, with the agreement that the locations made should be shared in the proportion of one-fourth

each; that the plaintiff, Hanlon, and Peterson then proceeded to Chichagoff, and on March 26 located the Over the Hill claim in the name of H. A. Bauer, by W. R. Hanlon, agent, the names of the plaintiff and Peterson being signed as witnesses—all of which names, as has been hereinbefore shown, being preceded by the word "locators," not "locator."

The plaintiff further testified in substance that the next day they located a claim called "Mystery," in his name and that of Peterson; and in April three other claims, named "Aurated," "Authentic," and "Cablegram," respectively, were located, one in the names of Peterson and the plaintiff, and the other two in the names of H. A. Bauer, W. R. Hanlon, Charles Peterson, and John Tuppela; that those five claims were the only ones located on that trip, and that Bauer never objected to the joining of Peterson in the work and locations, and never claimed but one-quarter of the claims. Peterson, by deposition, corroborated the testimony of the plaintiff in so far as it related to himself and his actions; and the record further shows that subsequently Bauer, to wit, on the 10th day of January, 1907, bought from Peterson his one-quarter interest in the five claims so located, taking his conveyance thereof, in consideration of which he deeded to Peterson a house and lot in Sitka; and that on the same day that he bought Peterson's quarter interest he drew and obtained from the plaintiff and Hanlon powers of attorney from them to sell their interest in the said five claims. The evidence shows further that the assessment work for 1908 upon the Over the Hill claim was done by the plaintiff, and that Bauer paid to the plaintiff $50 for his part thereof; that the annual labor on said Over the Hill claim for the years 1909, 1910, and 1911 was done by the plaintiff and W. R. Hanlon as part owners, and in January, 1912, they began the publication of a notice to forfeit Bauer's interest in the claim for his failure to perform or pay for his part of the annual labor for those three years, which publication appeared at least once a week for 90 days and was seen and read by Bauer; that the annual labor upon the said Over the Hill claim for the year 1912 was performed by the plaintiff alone as part owner, and that in January, 1913, the plaintiff published a notice to forfeit Hanlon's interest therein for his failure to perform or pay for his part of the annual labor for 1912, after which Hanlon sold his interest therein to the defendant Chichagoff Mining Company, which company paid the plaintiff, and thereby saved the forfeiture.

Enough has been pointed out, we think, to show that the findings of fact made by the court contrary to the findings made by the jury are unsupported by, and contrary to, the evidence in the case, and that the decree must be reversed, with directions to the court below to enter a decree adjudging the appellant to be the owner as against the defendant to the suit of the whole of the Rising Sun lode mining claim, and of an undivided one-half interest in the Over the Hill and Pacific lode mining claims, and directing a conveyance to him by the defendant to the suit of the legal title to the undivided one-half interest in the said Over the Hill claim conveyed to it by the government patent, and for an accounting of all ore extracted by the defendant from the

said Over the Hill claim, and for judgment in favor of the appellant for one-half of the value thereof, less one-half of the legitimate expenses of mining, extracting, and reducing such ore, and for an accounting of the whole of the value of the ore extracted by the defendant from the said Rising Sun claim, and for judgment therefor, less the legitimate expenses of mining, extracting, and reducing such last-mentioned ore, and for costs of suit.

Ordered accordingly.